IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TROY UPSHUR, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | No. 15-5434 |

## REPORT AND RECOMMENDATION

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff Troy Upshur brought this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"). Presently before this court are plaintiff's request for review, the Commissioner's response, and plaintiff's reply. For the reasons set forth below, we recommend that plaintiff's request for review be GRANTED in part.

I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiff is a forty-six year old man, who was born on August 17, 1969. (Tr. 34). Plaintiff has a ninth grade education. (Tr. 37). Plaintiff has past relevant work as a utility worker for a hotel and banquet room. (Tr. 51).

On June 14, 2012, plaintiff protectively filed an application for SSI. (Tr. 127-132). On September 10, 2012, the Social Security Administration denied plaintiff's claim. (Tr. 69-73). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ").

1

On March 6, 2014, ALJ Nadine Overton held a hearing, and plaintiff as well as an impartial vocational expert, Bruce Martin, testified.  (Tr. 28-56).  Plaintiff was represented at the hearing by Nathan Tinkey, Esq.  On May 30, 2014, the ALJ issued an opinion finding plaintiff not disabled under the Act since June 14, 2012, the date the application was filed.  (Tr. 27).  Plaintiff filed a request for review, and on August 21, 2015, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5).  Plaintiff subsequently commenced this civil action with the assistance of counsel.

## II.     LEGAL STANDARDS

Upon judicial review, this court's role is to determine whether the ALJ's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988).  "Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  Moreover, it is relevant evidence viewed objectively as adequate to support a decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979).  In determining whether substantial evidence exists, the reviewing court may not weigh the evidence or substitute its own conclusion for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the court determines the ALJ's factual findings are supported by substantial evidence, then the court must accept the findings as conclusive.  Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  Richardson, 402 U.S. at 401.  While the Third Circuit has made it clear that the ALJ must analyze all relevant evidence in the record and provide an explanation for disregarding evidence, this requirement does not

mandate the ALJ "to use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004). Rather, it is meant "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id. Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To establish a disability under the Act, the claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57 (3d Cir. 1988) (quoting Kangas, 823 F.2d at 777); 42 U.S.C. § 423(d)(1) (1982). The claimant satisfies his burden by showing an inability to return to his past relevant work. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979) (citing Baker v. Gardner, 362 F.2d 864 (3d Cir. 1966)). Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy. 20 C.F.R. § 404.1520. See Rossi, 602 F.2d at 57.

As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your

impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

## III.   ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to the five-step sequential evaluation process for adults, the ALJ determined that plaintiff had not been under a "disability," as defined by the Act, since June 14, 2012, the date the application was filed.  (Tr. 16-27).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 14, 2012, the alleged onset date.  (Tr. 18).  At step two, the ALJ found that plaintiff's status post gun-shot wound, tibial fracture, and anxiety disorder (post-traumatic stress disorder) were "severe" impairments within the meaning of the Regulation.  (Tr. 18).  In making this determination the ALJ relied upon the following medical records:

Mental Health Records

Plaintiff treated at Safe Meadow Health Center from January 2011 through February 2013.  (Tr. 191-226, 384-391).

On May 12, 2011, a Global Assessment Functioning ("GAF")[1] score of 50[2] was

---

[1] While the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–V") has discontinued the use of GAF scores, GAF scores remain medical evidence.  GAF scores were used by "mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults." Irizarry v. Barnhart, 233 Fed App'x 189, 190 n.1 (3d Cir. 2007).  A GAF score is not considered to have a "direct

recorded. (Tr. 197). On May 19, 2011, a progress note indicates that plaintiff was appropriately

groomed and dressed. Plaintiff discussed that plaintiff was having pain where he was shot. (Tr.

209). On January 30, 2012, a treatment plan indicates plaintiff's GAF score was 50. (Tr. 195).

Plaintiff reported keeping to himself, not eating, not sleeping, and having anxiety all of the time.

(Tr. 202). On March 15, 2012, it was reported that plaintiff was appropriately groomed and

dressed, and plaintiff's medications were helping him stay level. (Tr. 201). On May 16, 2012, a

progress note indicates that plaintiff was taking medication regularly and was having a slight

response to treatment. Plaintiff's self-care and domestic skills were intact. Plaintiff was

socializing less with family and friends. Plaintiff was having some angry outbursts, but there

were fewer instances of impulsive behaviors. Signs of moderate depression were present. (Tr.

200). A treatment plan from June 11, 2012 indicates that plaintiff's diagnoses were

posttraumatic stress disorder and gun-shot wound. (Tr. 191). Plaintiff was given a GAF score of

55. It was noted that plaintiff's anxiety was an active problem, and he was suffering from

agoraphobia. (Tr. 192). It was also noted plaintiff exhibits angry outbursts. (Tr. 194). The

treatment plan also noted that plaintiff was non-complaint with the treatment plan, and was

refusing to attend counseling sessions. (Tr. 193). A narrative report from the same date, June

11, 2012, indicates that plaintiff's self-care and domestic skills were intact. Plaintiff was fully

communicative, casually groomed, and tense. Plaintiff's speech was normal. Plaintiff was

---

correlation to the severity requirements, 66 Fed. Reg. 50746, 50764-65 (2000); however, a GAF score constitutes
medical evidence and must be addressed by the ALJ in making the disability determination. Watson v. Astrue, No.
08-1858, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009) (citing Colon v. Barnhart, 424 F. Supp. 2d 805, 812
(E.D. Pa. 2006)). See also Dougherty v. Barnhart, No. 05-5383, 2006 WL 2433792, at *9 (E.D. Pa. Aug. 21, 2006).
[2] A GAF score of 31-40 indicates "some impairment in reality testing or communication... or major impairment in
several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF score of 41-50
indicates serious symptoms or any serious impairment in social, occupational, or school functioning. A GAF score
of 51-60 indicates "moderate symptoms (e.g. flat effect and circumstantial speech, occasional panic attacks) or
moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental
Disorders (DSM-IV) at 32.

having outbursts or expressions of anger.  There were signs of severe depression.  (Tr. 199).  In July 2012, plaintiff showed no signs of depression or mood elevation, and no anger had been displayed.  (Tr. 391).

Plaintiff continued to be seen at Safe Meadow Health Center and on September 12, 2012, improvement was noted and plaintiff was not displaying anger.  Plaintiff's mood was entirely normal with no signs of depression or mood elevation.  Plaintiff was taking his medication regularly.  (Tr. 389).  Plaintiff again showed no signs of depression or mood elevation on October 17, 2012.  (Tr. 388).  On November 7, 2012, plaintiff was not doing well and needed assistance with domestic tasks.  Plaintiff exhibited signs of moderate depression.  However, plaintiff was attentive, fully communicative, and no anger was displayed.  (Tr. 387).  In December 2012, plaintiff was not doing well; however, plaintiff's domestic skills were intact, his relationships with family and friends were normal, and plaintiff had no outbursts of expression of anger.  Plaintiff showed signs of mild depression.  (Tr. 386).  On January 16, 2013, plaintiff's self-care skills were impaired and he needed assistance with domestic tasks.  (Tr. 385).  Plaintiff's relationship with family and friends was reduced and he showed signs of moderate depression along with chronic leg and back pain.  (Tr. 385).  A progress note from February 26, 2013, indicates that plaintiff's relationships with family and friends were normal, plaintiff displayed no signs of anger, and was sleeping well.  (Tr. 384).  Plaintiff presented with no signs of depression or mood elevations.  (Tr. 384).  Plaintiff discussed his chronic pain.  Plaintiff was informed that Safe Meadow would no longer be able to see him as a client.  (Tr. 384).

On October 3, 2012, Dr. Clarence R. Verdell, M.D., plaintiff's treating psychiatrist, completed a medical assessment.  (Tr. 285-291).  Dr. Verdell found plaintiff had poor to no ability to follow work rules, interact with supervisors, and maintain attention and

concentration.  Further, plaintiff's ability to deal with work stress was fair.  (Tr. 286).  Dr. Verdell noted that plaintiff gets easily agitated with receiving orders.  (Tr. 286).  It was found that plaintiff had poor to no ability to understand, remember, and carry out simple instructions. (Tr. 287).  Dr. Verdell indicated that plaintiff had poor to no ability to behave in an emotionally stable manner or relate predictably in social situations.  (Tr. 288).  Dr. Verdell explained that when it rains plaintiff's back and leg pain from his gun-shot wounds increases, and it triggers plaintiff's irritability and anger outbursts from the post-traumatic stress disorder.  (Tr. 288).  Dr. Verdell noted that plaintiff has suffered with post-traumatic stress disorder since 2008 and it has gotten progressively better with medication.  (Tr. 289).  It was noted that plaintiff has intense anxiety and shakes violently at times.  (Tr. 290).

Plaintiff treated at MedNet Healthcare Systems from April 26, 2013 through January 29, 2014.  (Tr. 392-425).  On May 9, 2013, Dr. Verdell conducted a Comprehensive Biopsychosocial Evaluation.  (Tr. 392-395).  Plaintiff was cooperative, appropriate in affect, behavior and thought content, neat, euthymic, oriented, and had a goal-directed thought process and intact memory and judgment and good insight (Tr. 394).  The diagnosis of PTSD was associated with a GAF score of 50 (60 in the year prior).  (Tr. 395).  The treatment notes indicate that in April 2013 and May 2013, plaintiff was having depressive mood and anxious behavior. (Tr. 409- 412).  On July 17, 2013 and July 31, 2013, it was noted that plaintiff had normal mood. (Tr. 405, 406).  The psychotherapist rated plaintiff's GAF as 45-50 when she treated and examined him on April 26, 2013 (Tr. 423), July 31, 2013 (Tr. 420) and again on October 30, 2013 (Tr. 415).  In October 2013, the treatment note indicated that plaintiff's mood changes due to his physical illness.  (Tr. 402).  On November 13, 2013, it was noted that plaintiff was anxious.  It was indicated that plaintiff was not isolating himself, but was avoiding crowds.  (Tr.

401).  On January 29, 2014, plaintiff was cooperative, with appropriate thought and normal

affect.  (Tr. 397).  Plaintiff seemed stressed and anxious.  (Tr. 397).  Plaintiff reported having

flashbacks of being shot.  (Tr. 397).

Physical Health Records

Plaintiff was admitted to the Hospital of the University of Pennsylvania through

the emergency department on September 5, 2011.  Plaintiff was discharged on September 9,

2011.  (Tr. 251-261).  Plaintiff presented with abdominal pain and distention.  Plaintiff was

diagnosed with a small bowel obstruction.  (Tr. 251-261).  Plaintiff was treated with a

nasogastric tube and discharged on September 9, 2011.  (Tr. 251).  Plaintiff was seen at Mercy

Hospital on June 30, 2012, with acute enteritis.  Plaintiff reported abdominal pain which was at a

level of 10, with vomiting and constipation.  (Tr. 238, 271).

An August 16, 2011 x-ray showed healed mid-shaft tibial fracture without

hardware complication and in near anatomic alignment with some post traumatic osteoarthritis of

the ankle (Tr. 236).  A CT scan of the lumbar spine dated June 30, 2012 that showed no evidence

of spondylosis or spondylolisthesis.  Sagittal alignment of the lumbar spine was maintained.  The

vertebral body heights and interveliebral disc spaces were also maintained.  (Tr. 304).  A later x-

ray dated September 4, 2012 showed the same and was characterized as "unremarkable" (Tr.

304).

On August 28, 2012, Dr. Jon Shapiro, M.D, a consultative examiner, completed a

disability evaluation.  (Tr. 292- 298).  Plaintiff reported to Dr. Shapiro that plaintiff was first shot

in the left and right legs in 1997.  Plaintiff had a tibia and fibula fracture and had rod placement

in the right leg.  Plaintiff reported chronic pain in the right leg.  Plaintiff also explained to Dr.

Shapiro that plaintiff was again shot in 2000, in the abdomen requiring laparotomy and

exploration.  (Tr. 292).  Plaintiff reported back pain since the abdominal gun-shot wounds.

Additionally, plaintiff explained that he has a history of tremor in his hands related to anxiety,

reduced with medication.  (Tr. 293).  Dr. Shapiro observed that the claimant had some lumbar

straightening, but negative straight leg raise.  (Tr. 295).  Plaintiff was stiff as he moved around,

but was able to go up on his heels and toes.  The claimant complained of ankle pain and did have

some visible swelling on the right ankle at the time of this examination.  (Tr. 295).  However, his

motor strength was 5/5 and his reflexes were 2+.  (Tr. 295).  He did not use a cane that day, but

favored his left leg when he walked.   (Tr. 295-296).

Plaintiff was examined at NextGen in November 2012, and was diagnosed as

having chronic pain syndrome.  (Tr. 309).  Plaintiff's gait and balance were intact, although he

had increased sensation of deep pain and pinprick.  (Tr. 310).  Plaintiff reported at this time that

he was able to dress, cook, shop and that he was sexually active.  (Tr. 314).  Jeffrey Dunbar,

M.D. diagnosed chronic pain syndrome and ordered pain management.  (Tr. 310).

Plaintiff was evaluated at Einstein Regional Orthopaedic specialists on January

2013 (Tr. 426-431).  On January 2, 2013, Dr. Gene W. Shaffer, M.D. examined plaintiff and

observed that he had a significant limp.  (Tr. 430).  Dr. Shaffer opined that the claimant's leg

pain did not appear to be related to his past tibial fracture or any broken screws or past repairs ("I

do not see really the tibia injury, especially 14 years out with onset of his pain, as the source of

this" and "mature long-healed appearance of the tibia") (Tr. 430).  On January 17, 2013, Dr.

Shaffer recommended physical therapy for strength training and stabilization.  (Tr. 427).

Plaintiff's strength was good 5/5, he had negative straight leg raises and symmetric reflexes (Tr.

427).  Plaintiff participated in physical therapy until August 2013 and did well while there (he

could sit, stand and walk for an hour without symptoms when discharged) (Exhibit 9F).   As he
testified at the hearing, the claimant has not returned to physical therapy.

        Plaintiff received physical therapy at NovaCare Rehabilitation from February 5,
2013 through August 14, 2013.  (Tr. 318-383).  At plaintiff's initial appointment on February 5,
2013, it was noted that plaintiff was unable to work secondary to dysfunction.  (Tr. 379).
Plaintiff's subjective examination revealed plaintiff was unable to lift; could sit, stand, and walk,
for up to ten minutes at a time.  (Tr. 381).  Plaintiff's objective examination showed plaintiff had
severely limited range of motion in the lumbar spine.  (Tr. 381-382).  The physically therapy
notes indicate the same subjective and objective findings on February 8, 2013 (Tr. 377),
February 12, 2013 (Tr. 375-76), February 26, 2013 (Tr. 370-71), March 1, 2013 (Tr. 368-69),
March 5, 2013 (Tr. 366-67), March 12, 2013 (Tr. 362-63), March 14, 2013 (Tr. 360-61), and
March 26, 2013 (Tr. 355-57).  On April 19, 2013, plaintiff had some improvement, but was still
unable to lift, plaintiff could still only sit for 10 minutes, but he could now stand and walk for 11
to 20 minutes at a time each and had moderate rather than severe limitation in range of motion of
his lumbar spine (Tr. 348, 350).  Plaintiff  had these same subjective and objective limitations
when subsequently treated on April 25, 2013 (Tr. 345-46), May 7, 2013 (Tr. 337-39), May 9,
2013 (Tr. 334-36), May 16, 2013 (Tr. 330-32), May 21, 2013 (Tr. 327-29), May 23, 2013 (Tr.
324-26), and on August 14, 2013 when he was last treated (Tr. 318-19).

        Continuing with the five step analysis, the ALJ moved onto step three.  At step
three, the ALJ found plaintiff does not have an impairment, or combination of impairments that
meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P,
Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.926).  (Tr. 18).

        At step four, the ALJ found that plaintiff has the residual functional capacity to

perform sedentary work except that plaintiff can never climb ladders, ropes or scaffolds.

Plaintiff can occasionally climb ramps and stairs.  Plaintiff can occasionally balance, stoop,

kneel, crouch and crawl.  Plaintiff can understand, follow, and remember simple instructions in

the context of simple routine, repetitive and concrete tasks.  Plaintiff can perform in a low-stress

job.  Low stress is defined as involving only occasional decision-making, only occasional

changes in the work setting, and only occasional judgment required on the job.  Plaintiff requires

a hand-held device for prolonged ambulation and standing.  Plaintiff can use the contralateral

upper extremity for carrying and lifting (ten pounds occasionally and less than ten pounds

frequently).  Plaintiff requires an at-will sit/stand option.  (Tr. 20-21).  The ALJ considered all

symptoms and the extent to which the symptoms could reasonably be accepted consistent with

the objective medical evidence and other evidence.  Further, the ALJ considered opinion

evidence.  (Tr. 21).

   Finally, at step five the ALJ found that plaintiff is unable to perform any past

relevant work.  (Tr. 25).  However, there are jobs that exit in significant numbers in the national

economy that plaintiff can perform.  (Tr. 26).  Thus, the ALJ determined that plaintiff has not

been under a "disability," as defined in the Social Security Act, since June 14, 2012, the

application date, through the date of the ALJ's decision.  (Tr. 27).

IV. PLAINTIFF'S CONTENTIONS

   Plaintiff alleges that: 1) the ALJ erred in the residual functional capacity

assessment; 2) the ALJ erred at step five of the sequential evaluation process in finding that

plaintiff could perform the jobs identified by the vocational expert; 3) the ALJ erred in not giving

plaintiff's treating psychologist's opinion proper deference; and 4) the ALJ failed to properly

consider the combined effects of plaintiff's impairments and did not properly assess plaintiff's

credibility regarding plaintiff's subjective complaints.

V.      DISCUSSION OF MERITS

The Commissioner's findings must be affirmed if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). The role of this court is to determine whether there is substantial evidence to support the Commissioner's decision. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993). In coming to a decision, it is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Richardson v. Perales, supra.

A.    Conflict Between Vocational Expert's Testimony and Information in the
        Dictionary of Occupational Titles

Plaintiff challenges the ALJ's finding at step five, that there are jobs that exists in significant numbers in the national economy that plaintiff can perform.  Plaintiff argues that the ALJ failed to follow the requirements of SSR 00-4p because the ALJ did not ask the VE about a conflict between the VE's testimony and information contained in the Dictionary of Occupational Titles ("DOT").  Plaintiff alleges that the ALJ erred by finding plaintiff is able to perform work as a food and beverage order clerk (DOT, 209.567-014), document preparer (DOT, 249.587-018), and telephone quotation clerk (DOT, 237.367-046) because the ALJ failed to resolve the conflict between the DOT descriptions of the jobs' reasoning levels and the restriction on plaintiff given to the VE by the ALJ.  Plaintiff explains that the ALJ's hypothetical to the VE placed a reasoning restriction on plaintiff that plaintiff can understand, follow, and remember simple instructions in the context of simple, routine, repetitive and concrete tasks. Plaintiff argues that according to the DOT the positions of food and beverage order clerk, document preparer, and telephone quotation clerk require greater reasoning skills than those

imposed by the ALJ's limitation of jobs with simple, routine, repetitive tasks.  Plaintiff states that

a limitation of simple, routine, repetitive tasks allows for only level 1 reasoning skills.  Plaintiff

further argues that according to the DOT all three jobs identified by the vocational expert require

level 3 reasoning skills, which require the ability to carry out "detailed" instructions.  This

exceeds the ALJ's residual functional capacity finding based on its limitation to "simple routine

repetitive tasks."

   The DOT lists all jobs available in the national economy and the skill

requirements necessary to perform each job.  SSR 00-4p, at 8.  In particular, the Specific

Vocational Preparation ("SVP") defines the skill level required for the job, while the General

Education Development ("GED"), which includes Reasoning Development, Mathematical

Development, and Language Development, provides informal and formal educational

requirements.  DOT, Appendix C, 1991 WL 688702; see also McHerrin v. Astrue, No. 09–2035,

2010 WL 3516433, *9 (E.D.Pa. Aug.31, 2010). (discussing the relevant sources in assessing

plaintiff's ability to perform past work in light of limitations).  The reasoning development

requirement within the GED is at issue here.  The SVP levels listed in the DOT also correspond

with the Code of Federal Regulations' three categories of work – unskilled, semi-skilled, and

skilled – however, the regulations do not specify reasoning requirements and do not correspond

with the reasoning development levels in the DOT.  McHerrin, 2010 WL 3516433, at *9.  We

note that the reasoning development requirement is a factor to consider in addition to the

classification of unskilled work.

   In the DOT, a job with reasoning level 3 is defined as the ability to "apply

commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic

form.  Deal with problems involving several concrete variables in or from standardized

13

situations." DOT, Appendix C, 1991 WL 688702.  A job with reasoning level 2 is defined as the "ability to apply common sense and understanding, to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations." Id.  A job with a reasoning level of 1 requires skills to "Apply commonsense understanding to carry out simple one-or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." Id.

SSR 00–4p provides guidance to resolve conflicts between the DOT and occupational evidence provided by a VE.  SSR 00–4p, at 1.  The Administration explained that "[w]hen there is an apparent unresolved conflict between vocational expert or vocational specialist evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the vocational expert or vocational specialist evidence to support a determination or decision about whether the claimant is disabled." Id. at 2.  "Specifically, an ALJ is required to (1) ask, on the record, whether the [vocational expert's] testimony is consistent with the DOT, (2) elicit a reasonable explanation where an inconsistency does appear, and (3) explain in its decision how the conflict was resolved." Burns v. Barnhart, 312 F.3d 113, 127 (3d Cir.2002).  Although failure to comply with these requirements may warrant remand in a particular case, the presence of inconsistencies does not mandate remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." Rutherford, 399 F.3d at 557(citing Boone v. Barnhart, 353 F.3d 203, (3d Cir.2004).

In the case at bar, the ALJ asked the vocational expert whether his testimony was consistent with the DOT, thereby meeting the ALJ's obligation to ask the vocational expert if there were inconsistencies between the DOT and the vocational expert's testimony.  The

remaining question is whether the ALJ should have recognized the inconsistency, and obtained a reasonable explanation for it. The analysis of these issues is controlled by the Third Circuit's decision in Zirnsak v. Colvin,777 F.3d 607 (3d Cir.2014).

In Zirnsak, the Court of Appeals addressed at length the "split of authority as to whether an inherent conflict exists between a job requiring level 3 reasoning and finding that a claimant should be limited to simple, routine tasks and unskilled work." 777 F.3d at 617-18. Some courts have held there was a *per se* inconsistency between simple, repetitive job limitations and level 3 reasoning, while others have held there was not. Id. The court in Zirnsak declined to find a *per se* conflict, but instead focused its analysis on "whether a failure to inquire about or reconcile a conflict caused any harm to the claimant" to determine whether remand was necessary. Id. at 618. The court in Zirnsak applied the analysis in Terry v. Astrue, 580 F.3d 471, 478 (7th Cir.2009), to determine whether an inconsistency existed in the particular case before it, and concluded that it did not. Id. at 618–19. In doing so, the Third Circuit provided guidance on the factors to be considered when performing this case-specific analysis: 1) whether plaintiff actually argued that he was incapable of performing the jobs recommended by the vocational expert, 2) whether inconsistencies between the vocational expert's testimony and the DOT were identified at the hearing, and 3) whether or not the occupations listed by the vocational expert were intended to be exhaustive or were merely illustrative. Id.

First, while plaintiff here states that he cannot perform the jobs identified by the vocational expert, plaintiff does not give a detailed argument as to why plaintiff is incapable of performing jobs requiring a reasoning level of 3. However, the undersigned notes that plaintiff has a ninth grade education and testified that he attempted to obtain his GED. Additionally, plaintiff testified that he had too much trouble concentrating and was unable to obtain a GED.

(Tr. 39).  The vocational expert identified plaintiff's past relevant work, as that of a utility

worker for a hotel and banquet room (DOT, 922.687-058).  The DOT lists plaintiff's past

relevant work as having a GED reasoning level of 2.  Thus, nothing in the record indicates that

plaintiff has performed work with a reasoning level 3 in the past.  The ALJ noted that plaintiff is

typically well-groomed and has intact activities of daily living.  (Tr. 22).  However, on

November 2012, December 2012, and January 2013, it was reported that plaintiff was not doing

well, needed assistance with domestic tasks, and his self-care skills were impaired.  Additionally,

in May 2011, January 2012, and May 2013, plaintiff was given GAF scores of 50.  (Tr. 195, 197,

395).  In April 2013, July 2013, and October 2013 plaintiff was given a GAF score of 45-50.

(Tr. 415- 423).  A GAF score of 41-50 indicates serious symptoms or any serious impairment in

social, occupational, or school functioning.  Diagnostic and Statistical Manual of Mental

Disorders (DSM-IV) at 32.

Second, unlike in Zirnsak, plaintiff's counsel appears to have attempted to point

out the inconsistency between the DOT and the vocational expert's testimony.  On cross

examination the following exchange occurred between plaintiff's counsel and the VE:

> Q ... The limitation in Hypothetical 1, that the judge gave, regarding simple
>    instructions -- the simple, routine work?
> A    Yes.
> Q    Did you understand that as precluding the ability to carry out detailed written
>    and oral instructions?
> A    Yes. These -- these particular jobs I cited aren't –the hallmark is not a
>    complex task or instruction that goes along with it in performing the critical
>    functions of the work. (Tr. 54-55).

Plaintiff's counsel also asked the vocational expert if it was accurate that reasoning level and

SVP are independent concepts in the DOT.  The vocational expert replied that they are.  (Tr. 55).

Finally, unlike in Zirnsak, the vocational expert in the matter at bar did not state that the

occupations listed was just a sampling of jobs available in the national economy.  When asked if

there were jobs in the national economy that plaintiff could perform, the vocational expert simply responded with three jobs,  food and beverage order clerk (DOT, 209.567-014), document preparer (DOT, 249.587-018), and telephone quotation clerk (DOT, 237.367-046). (Tr. 52-53).  Thus, the court cannot determine if there are additionally jobs in the national economy that the vocational expert believed plaintiff could perform, and that the jobs mentioned by the vocational expert were intended to be merely illustrative.  The facts of the instant matter differ in significant ways from the facts the court addressed in <u>Zirnsak</u>.  Thus, it is recommended that plaintiff's request for review be granted as to issue and the matter be remanded for further explanation as to whether there are jobs that plaintiff can perform in the national economy.[3]

Therefore, we make the following:

<u>RECOMMENDATION</u>

AND NOW, this 30th  day of June, 2016, it is RESPECTFULLY RECOMMENDED that Plaintiff's Request for Review be GRANTED in part, and the case remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

BY THE COURT:


 /S LINDA K. CARACAPPA
LINDA K. CARACAPPA
UNITED STATES MAGISTRATE JUDGE

---

[3] Plaintiff's remaining claims need not be discussed at this time, since the court is recommending that the case be remanded for the ALJ to properly assess if there are jobs in the national economy that plaintiff can perform.  A remand may produce different results on plaintiff's application, making discussion of the remaining claims moot. See Steinberger v. Barnhart, 2005 WL 2077375, at *4 (E.D.Pa. Aug. 24, 2005)("Having concluded…that remand to the ALJ for a new evidentiary hearing is appropriate, the Court will not address [the] other arguments for remand, as the ALJ's findings may be revised in any decision issued following the new hearing.")